## Ogden *et al. versus* Porterfield.

If, in a conveyance of land, a division line existing on the ground, be recognised and adopted by the parties, it will control the quantity of land purporting to be conveyed or reserved by the deed.

Where there is a discrepancy between the lines upon the ground, and the description in the deed, the former must prevail, unless in case of mistake or fraud.

A party is bound to take notice of anything in the line of the title purchased, that will limit or control the description in the deed.

ERROR to the Common Pleas of *Venango county.*

This was an ejectment by John Porterfield against Armstrong Ogden and Joseph Ogden, for 30 acres of land on the west side of, and adjoining, the Allegheny river, in Scrubgrass township, Venango county.

The tract of land, of which the premises in dispute were a part, was originally settled by John Fritz, under an agreement with John Field, the warrantee, dated the 2d June 1800, whereby it was agreed that when the settlement should be completed, Field should procure a patent for the land, and convey to Fritz 200 acres thereof, to be divided by a straight line on the end of the place, including all the improvements of the said John Fritz, as a compensation for his making the actual settlement.

About 1819 or 1820, Walter Lowerie, the agent of John Field, the warrantee, and Fritz, the settler, ran a line upon the ground, dividing the land between the parties, in accordance with the agreement; which was ever afterwards recognised and treated as the division line, by the parties, and those claiming under them. It was known as the "Lowerie line."

On the 26th November 1836, James Porterfield, under whom both parties claimed title, had become the owner of the entire tract; and, on that day, he made a contract with his brother, John Porterfield, the plaintiff below, that, in consideration that John Porterfield would take out the office title to the land in the name of James Porterfield, he would convey to him the tract, reserving to himself "200 acres, with the usual allowance, off the

south end of said tract, laid off by a parallel line with Thomas Kerr's line," adjoining on the south.

John procured a patent to be issued to James Porterfield, on the 19th December 1837; and on the 30th June 1845, the heirs of James Porterfield, who was then deceased, conveyed the tract to John Porterfield, in fee, by the following description:—"All the right, title, interest, and claim of the said parties of the first part, to what is termed the land jobber's end or part of a certain tract or lot of land, situate in Scrubgrass township, Venango county, Pa., containing three hundred and ninety-eight acres and fifty-eight perches and allowance, &c. Conveyed by patent from the Commonwealth of Pennsylvania to said James Porterfield, the nineteenth day of December, one thousand eight hundred and thirty-seven, enrolled in Patent Book H., vol. 38, page 333. (Now it is understood that this conveyance includes all of the aforesaid tract except two hundred acres with allowance, being the south part of said tract, or the part articled for the benefit of John Fritz with John Field, dated 2d of June 1800.)"

On the 6th May 1846, Nancy Porterfield, the mother of the plaintiff below, conveyed to Armstrong Ogden, one of the defendants, her life estate in the 200 acres reserved by the heirs of James Porterfield, off the south end of the tract. On the 26th April 1847, Samuel Porterfield, one of the brothers and heirs of James Porterfield, conveyed to Armstrong Ogden his interest in the same premises. And on the 10th May 1847, Joseph, Robert, and George Porterfield, other heirs, conveyed to him their respective interests.

On the 18th October 1852, John Porterfield, the plaintiff, contracted to convey to Ogden his interest in the same premises, as one of the heirs of James Porterfield, deceased, by the following agreement:—

"Article of agreement, entered into the 18th day of October, A. D. 1852, between John Porterfield, one of the heirs at law of James Porterfield, deceased, late of Scrubgrass township, Venango county, Pa., of the first part, and Armstrong Ogden, of the same place, of the second part, witnesseth, that the said John Porterfield agrees to sell and hereafter convey, all his right, title, interest, claim, and also the right, title, interest, and claim of William Porterfield and Nancy Smith, heirs at law of James Porterfield, deceased, of, in, and to the within-described lot or parcel of land, situated in the township of Scrubgrass, to the party of the second part, by lands of Thomas Kerr on the south, by lands of Dr. Crawford on the west, by land of John Porterfield on the north, and the Allegheny river on the east. For and in consideration thereof, the said party of the second part agrees to pay $600, in manner following: $200 on the 1st of April 1853, and $200 on the 1st of April 1854, and the remainder, $200, on the 1st of

[Ogden *et al. v.* Porterfield.]

April 1855, at which time the said John Porterfield agrees to make, execute, and deliver to the said A. Ogden, his heirs or assigns, the quit claims and releases of all their right, title, interest, and claim, of, in, and to the within-described lot, tract, piece, or parcel of land, as heirs at law of James Porterfield, deceased, but no other; said James Porterfield having died seised of the same intestate, and without lawful issue; said tract of land containing 200 acres, and allowance. In witness whereof we have set our hands and seals, the day and date first above written."

Armstrong Ogden procured a survey to be made of 200 acres, and allowance, off the south end of the tract, by a line running parallel with Thomas Kerr's line, and took possession, claiming up to that line. The "Lowerie line, is about 19 perches further south, and Porterfield claimed to it. The land in controversy lies between these two lines.

The court below (McCalmont, P. J.), in answer to numerous points presented by both parties, instructed the jury—That if Field and Fritz, by a surveyor of their mutual selection, procured a survey of a line, and marked on the ground, to designate the limits of their mutual claims to the tract in question, in which they each acquiesced ever afterwards, not only they, but all claiming under them respectively, or by the designation of boundary so made by them, are bound by it, although the boundary so marked may not correspond with the amount of land in their deeds. That if the heirs of James Porterfield knew that Field and Fritz had made and marked a consentable division line to designate the respective ownerships of the landowners and settler, and, in their conveyance to the plaintiff, recognised and adopted it, or otherwise designated it as the southern boundary of the part conveyed to him, they and all claiming under them by subsequent conveyance and bounded on the north by land of John Porterfield, are bound by it, although entirely mistaken as to the quantity of land south of it. That even if there was a mistake in establishing that line, if, with knowledge, it was acquiesced in for thirty years, the mistake could not, after such a period of time, be corrected; it would bind the parties prior to James Porterfield's purchase, if they acquiesced in it. And that if James Porterfield, or his heirs, prior to the purchase by Ogden, with knowledge of the facts, agreed to that line, without further survey, it would bind; if not, it would be otherwise, and the defendant would be entitled to a verdict.

To this charge the defendants excepted; and a verdict and judgment having been rendered for the plaintiff, they removed the cause to this court, and here assigned the same for error.

*Myers* and *Kinnear,* for the plaintiffs in error.

*Kerr,* for the defendant in error.

[Ogden *et al. v.* Porterfield.]

The opinion of the court was delivered by

THOMPSON, J.—John Field was the warrantee of the tract of land out of which has grown the present controversy. On the 2d of June 1800, he leased it to one John Fritz, who engaged to complete the settlement required by the Act of 1792, the land being situate on the west bank of the Allegheny river. When the settlement should be completed, Field was to procure a patent for the tract, and to make a conveyance of 200 acres to Fritz, the settler, to include his improvements. About the years 1819 or 1820, Fritz procured a survey of the tract to be made, and had the division line run between his portion of the land and that of the warrantee or the " land-jobber," as warrantees at that time were generally called. No objection was ever made to this division by Field, nor did he ever procure the patent and make the conveyance. In 1824 or 1825, two brothers by the name of Mattorn became the owners of the settler's part of the tract; and in dividing the land between themselves, they recognised and bounded themselves by this division line, as appears by a surveyor and others engaged in making the division, and they afterwards claimed to and occupied by it. Thus two sets of claimants recognised it as the division line of the tract.

Prior to the 26th of November 1836, James Porterfield, from whom both parties derive title, became the owner of the entire tract; and by contract of that date agreed with his brother John, the defendant in error, in consideration that he would take out the office-title for the land in his name, he would convey to him the tract, reserving to himself " 200 acres with the usual allowance, off the south end of said tract, laid off by a parallel line with Thomas Kerr's" adjoining on the south. John procured the patent in 1837, and on the 30th of June 1845, the heirs of James Porterfield, he having died sometime previously, conveyed the tract to John, and described his interest in it as " the land-jobber's end or part of the said tract," stated to contain 398 acres 58 perches and allowance, and in their reservation, they set forth that the conveyance includes all the aforesaid tract, except 200 acres with the allowance, being the south part of said tract or part articled for the benefit of John Fritz, with John Field, dated the 2d of June 1800. By an article of agreement, dated the 18th of October 1852, between the parties to this suit, the plaintiff below agreed, for the consideration therein mentioned, to release and quit-claim unto Armstrong Ogden, one of the defendants below, his interest and that of two others of the heirs in the James Porterfield portion of the tract, describing it as parcel of the land of which James Porterfield died seised, but " no other," and containing 200 acres and allowance. The deeds of the mother and other heirs of James Porterfield are similar in the description of the land with the contract of John, just men-

[Ogden *et al. v.* Porterfield.]

tioned. Under this state of facts, and evidence as to the existence of the line dividing the entire tract between the settler and warrantee, and of occupancy by that line by owners and claimants subsequently, including both James and John Porterfield, and the heirs of the former, the plaintiff below contended and prayed the court to charge, that, in the absence of any new line, and from the evidence afforded of its recognition in the deeds and contracts between the Porterfields and with Ogden, all parties were bound by it, although there was not the full amount of land contained within the boundary called for in and by the reservation or exception under which the defendant claimed;—that the lines on the ground would control the deed as to quantity. This was the substance of their points.

The defendant, in reply to this, claimed that as James Porterfield was the owner of the entire tract, and the common source of title to both parties, the division line between Fritz and Field ceased, as to him, to have any force or effect, and as he contracted with John, only to convey him the residue of the tract after reserving to himself 200 acres and allowance, off the south end, by a line laid off parallel with Thomas Kerr's line, and as there was but 398 acres in the whole tract, therefore, as his reservation was of 200 acres and allowance, the plaintiff was not entitled to a recovery of any land that would diminish this amount, and must be limited exactly to what would leave intact the number of acres mentioned in the reservation.

The essence of these positions is plainly this: on the one hand, that if a line existed on the ground, that the parties agreed to and bargained by, it will control and limit the deed—and on the other, that the deed obliterates or controls the line, notwithstanding it was acquiesced in by the parties, and that it was error in the court to submit the question of the existence of the line, and of the knowledge and acquiescence in it as a dividing line, on part of James Porterfield and his heirs.

The position of the defendants below is not tenable: in Blasdell *v.* Bissell, 6 *Barr* 258, and in Dawson *v.* Mills, 8 *Casey* 306, the doctrine that a conveyance made subsequently to a survey, dividing land between parties is referable to that survey, and limited by it, was fully held. In grants by the Commonwealth, they rarely, if ever, describe the exact quantity contained in the official survey on the warrant, and nobody ever pretended that the survey was to be either enlarged or diminished to accord with the patent. The survey and the conveyance are the distinctive and operative acts in the transmission of real property, and where they differ from each other one must of necessity control the other, if each stands unaided by extrinsic explanation, or the discrepancy could never be adjusted. In such an exigency, courts have always held the demarcation of the boundaries as the substantive act in fixing

[Ogden *et al. v.* Porterfield.]

the limits of the grant, and the deed as evidence of them—the former the *factum*, and the latter the representative; and hence the rule that the survey, if unimpeachable for fraud or mistake, controls the deed, where there is a discrepancy as to the extent of the grant.

In accordance with these principles were the views of the learned judge below; and he left it, on the evidence, as a question for the jury to say, whether or not the line on the ground dividing the tract, and which had been there since 1821, had been adopted as the dividing line between James and John Porterfield, or subsequently by the heirs of the former, in their conveyance to the latter; with the instruction that, if so adopted, it would control the conveyance made by it.

This was undoubtedly right; for an adopted line by parties in interest is quite as good as one run by them, or by their procurement. There is nothing official required in surveys made preparatory to grants by individuals, and hence they may mark lines for themselves, or adopt those that anybody else has made and marked. It is only by adoption that the line here derives its force—the fact that it was run as a division line, and claimed to as such by parties interested in the land, is evidence of its adoption, and a reason for believing that it was meant to be adopted.

There was evidence, we think, on the papers given in evidence, when considered in the light of the acts of occupancy testified to, to justify fully the reference of the question of adoption to the jury.   Indeed, I think that both the contract between John and James, as well as the conveyance of the heirs of the latter to the former, prove this.   Let us see.

By the agreement of the 26th of November 1836, John Porterfield covenanted to procure a patent for the tract, in consideration of which James covenanted to convey it to him, reserving to himself "200 acres, with the allowance off the south end of said tract, *laid off* by a parallel line to Thomas Kerr's line." By this, James reserved the settler's part, and John was to get what was the land-jobber's end, and it was said to be *laid off* by a parallel line known as Thos. Kerr's line.  The grammatical construction of the words used, certainly expresses the idea that a line existed to which it referred, and as there was such a line, it is difficult to resist such a conclusion.  As there was but one line on the ground at the time, and taking the words "laid off" in the past tense, as they seem to have been used, it must have been laid off by that line.  The probability that this was the line intended, as the division between these brothers, is very strong, when we consider the nature and object of the contract between them.   They were about to put themselves, in most respects, in the position occupied by the original warrantee and the settler under him.   John was to do what the former had undertaken to

[Ogden *et al. v.* Porterfield.]

do, namely, to get the patent, and the latter was to have the settler's portion of the track. This was just the position they occupied in regard to this land, already divided by a line between parties similarly interested in the land at a former period. These considerations, certainly, serve to strengthen the construction we give to the words used in the contract.

When, added to this, is the testimony of occupancy by this line, it is difficult to doubt about the meaning of the words used. But the heirs of James Porterfield, in their deed, made in execution of their intestate's contract with John, more clearly disclose what was meant by that contract. In their deed, they describe the portion of the land which John was to have as "the land-jobber's end or part." And in reserving their share, they say, "it is understood that this conveyance includes all of the aforesaid track, excepting 200 acres and allowance, being the south part of the track, or the part articled for the benefit of John Fritz, with John Field, dated the 2d of June 1800." Here was a recognition of the relation that existed between the settler and the warrantee, and it was during the existence of that relation that the land had been divided and the line run, separating the parts from each other. The line was on the ground. This was an indisputable fact, and it divided the land-jobber's end or part from the south end, or part articled for the benefit of the early settler. The deed of conveyance passed the part thus laid off to John, and the other end was reserved to the heirs. There are no words to restrain this otherwise obvious construction, and as they made no new line, it is very evident that the conveyance between the parties to it was by what was known as the "Lowerie line," so that in this view of the case the charge might, without error, have been much more decisive against the defendant below than it appears to have been.

John Porterfield's own contract to convey to Ogden does not, as has been contended, estop him from claiming that the boundary thus adopted should have the effect of limiting the deed as to amount. He covenanted to release all his right and title as an heir, and that of two others of the heirs of James Porterfield, which he held by assignment, in and to that portion of the tract of which James had died seised, and "no other." If James died seised only of land bounded by the line alluded to, the land covenanted to be conveyed under this description would be bounded by the limits of his seisin, notwithstanding the further description of quantity, as 200 acres and allowance, for the reasons already given in another part of this case. The maxim, *id certum est quod certum reddi potest*, would here apply.

It cannot be said that Ogden may have been deceived in regard to his purchase. He was bound to know the law, and to know that the quantity was liable to be controlled by the limits or

[Ogden *et al. v.* Porterfield.]

boundaries on the ground; so, too, as to the recognition of the lines by those under whom he claims title, as evidenced by their deeds and acts under them. This title exists, by way of reservation or exception, out of the grant of the whole tract to the plaintiff below, and the instruments given in evidence showing this, lay in the line of his title, the contents of which he must have known. Indeed, that he had notice is a part of the case of the plaintiff in error, as it is stated on his part, that the deed of the heirs of Porterfield was on record, and that he did take notice of it, and claims on account of its concurrence in quantity with his own deeds. But he was bound to take notice also of anything in the title he purchased that would limit this amount, as we have seen the line, if adopted, would do.

We see no error in the manner in which the learned judge of the Common Pleas put this case to the jury, nor anything in either of the bills of exceptions for which we should reverse. The matter of notice offered to be proved by the oath of the defendant was totally immaterial in the case, and therefore we do not discuss it further.

Judgment affirmed.