PETER STAUB et ux. *v.* W. H. HAMPTON
and
PETER STAUB et ux. *v.* E. M. JONES et al.

(*Nashville.* September Term, 1906.)

1. **EVIDENCE.** Parol, admissible to identify land.

It is well settled that parol evidence is admissible to identify land described in a conveyance and to show its true location. (*Post, pp.* 725-731.)

Cases cited and approved: Dougherty v. Chestnutt, 86 Tenn., 1; Snodgrass v. Ward, 3 Hayw., 40; Weatherherd v. Sewell, 9 Humph., 289; Dodson v. Litton, 5 Cold., 619; Murray v. Hobson, 10 Colo., 66; and other cases cited in the opinion, on pages 726-731.

2. **DEEDS OF CONVEYANCE OF LAND.** Effective as intended where description is erroneous as to land actually surveyed and marked out on the ground.

Where land is actually surveyed, and the lines and corners are marked on the ground, and the specific land sold and purchased is thus pointed out to the purchaser, but through error and mistake in drafting the deed intended to convey said land, the description does not embrace it, the deed will operate to convey the land so intended to be conveyed, and not that embraced in the erroneous description. (*Post, pp.* 723-743.)

Numerous cases cited and approved in the opinion, on pages 731-743.

3. **SAME.** Same. Case in judgment.

Where a deed of conveyance of land calls for its beginning corner at a stake in the east boundary line of a five-thousand-acre tract entered in the name B, and forty-seven poles north of the southeast corner of such tract, which tract was then erroneously supposed and assumed to be located at that particular place with reference to the land actually intended to be conveyed

Staub v. Hampton.

and actually surveyed and marked on the ground and pointed out to the purchaser, and so described with reference to, and in accordance with, such erroneous supposition and assumption, but it is subsequently discovered that the said entry in the name of B was not located as supposed, but was located some distance therefrom, the deed will be effective to convey the land as intended and located with reference to the erroneously supposed location of said entry, and in accordance with the survey and the marking of the lines and corners on the ground. (*Post, pp.* 708-743.)

Numerous cases cited and approved in the opinion, on pages 731-743.

4. **SAME. Same. Same.** Such rule is not against policy of registration laws, where subsequent purchaser had notice.
The rule in the foregoing headnotes that the actual survey, with lines and corners marked upon the ground, of the land intended to be conveyed will control the erroneous and unintended description in the deed and make the deed operate to convey such land, is not contrary to the policy of the registration laws as against a subsequent purchaser of the land put upon notice by the possession of the previous purchaser. (*Post, p.* 743.)

Cases cited and approved: Macon v. Sheppard, 2 Humph., 335, 338, 339; Davis v. Cross, 14 Lea, 637, 642; Banks v. Ammon, .27 Pa., 172, 175.

5. **SAME. Same. Same. Same.** Such rule applied in ejectment suit without bill in chancery for correction and reformation of deed.
Such rule that an actual survey, with lines and corners marked on the land, will control the erroneous and unintended description in the deed, is a rule of property, long recognized and supported by indubitable and multitudinous precedents, may be applied in ejectment to recover the land, without filing a bill in chancery for the correction and reformation of the deed. (*Post, p.* 743.)

6. **SAME. Same. Same. Same. Same. Such rule is not in violation of the statute of frauds.**

Such rule that an actual survey, with lines and corners marked on the land, will control the erroneous and unintended description in the deed, is not in violation of the statute of frauds. (*Post, pp.* 743, 744.)

FROM GRUNDY.

Appeal from the Chancery Court of Grundy County.—
T. M. McCONNELL, Chancellor.

MR. JUSTICE NEIL made the following statement of facts:

These were ejectment bills brought to recover 5,900 acres of land lying in Grundy county, the bill in the first-named case describing the land as follows:

"5,900 acres of land lying in the Sixth and Eleventh districts of Grundy county, Tennessee, and bounded and described as follows: Beginning at a stake on the east boundary line of the five thousand-acre tract, entered in the name of Carrol Brown (alias Castle Brown), and forty-seven poles north of the southeast corner of said tract; thence south forty-seven poles to said southeast corner; thence west with the south boundary line of said tract, passing the southwest corner of said tract, in all 1,110 poles, to a stake; thence south 640 poles to a stake;

thence east 1,450 poles to a stake; thence north 687 poles to a stake; thence west 340 poles to a stake."

The bill in the second case sets out the same description, and then adds the following:

"And which is more accurately described according to a survey of Isaac Hill, in the cases of *Peter Staub et al.* v. *W. B. Byers et al.* and *Peter Staub et al.* v. *J. J. Woodlee et al.* formerly pending in the chancery court at Altamont, Tennessee, as follows: Beginning at the northwest corner of the said tract, it being a post oak (now dead), with pointers; about 600 yards east of a house of Hiram Nunley; thence east with a marked line 1,081 poles to a chestnut, marked as a corner; thence north 47 poles to a stake and pointers; thence east with a marked line 340 poles (the northeast corner), and by a further marked line beginning at said northwest corner, thence running south 640 poles to a stake, with pointers, running east with a marked line 1,450 poles; and thence north 695 poles to said northeast corner."

The deed under which the complainant claims describes the land as set forth in the first bill. This deed was made by the Monroe heirs, eight in number, through Massey Hill, as their attorney in fact. The Monroe heirs claimed the land under S. B. Barrell, who was the grantee from the State. Four of these heirs repudiated the action of Massey Hill, three of them on the ground that they were married women, and had no power to convey lands by power of attorney, and one of them on

the ground that he did not join in the power of attorney. Accordingly, these four persons filed a bill in equity against Peter Staub, and had the deed set aside as to them. However a lien was declared in that case against the land for their proportion of the taxes paid, and also of the purchase money, and subsequently, under a decree enforcing this lien, Peter Staub became the purchaser of the interest of these parties in the land under the same description which appeared in his original deed.

The principal defendant is the Thomas Coal Company, which claims the land under certain conveyances and tax proceedings going back to the Monroe heirs.

The bills in the present case were filed, asserting title to the 5,900 acres, which is claimed both by the complainants and by the defendant Thomas Coal Company. The claims of the defendant Hampton and others in that interest were considered in the court of chancery appeals; but, as no error has been assigned here on that portion of the decree, it need not be further noticed.

The substance of the controversy may be stated briefly as a claim on the part of the complainants that they own the 5,900 acres of land upon which the Thomas Coal Company has entered, and that it falls within the terms of their deed, when that deed is rightly understood and considered, in relation to the survey laid down upon the ground at the time the transaction was entered into between the complainants, or complainant Peter Staub and the Monroe heirs, and on the part of the defendants that the Castle (or Carrol) Brown entry lies far to the

north of the 5,900 acres in controversy, and therefore that the deed does not describe at all the land which is the subject of the controversy between the parties.

The court of chancery appeals adjudged the controversy in favor of the complainants, and from this the defendants have appealed to this court and assigned errors.

The facts found by that court, so far as necessary to be stated, are as follows:

"As to the true location of the Castle (or Carrol) Brown entry, the weight of the evidence shows that it was not at or near the beginning corner of the tract, as now claimed to be located by the complainant, and that a deed calling to commence at a point forty-seven poles north of the southeast corner of the correct location of the Castle (or Carrol) Brown tract, and to run thence south forty-seven poles, and thence west with the south line of the Castle (or Carrol) Brown entry or tract, and on, as called for in the complainant's title papers, would not cover the land in litigation.

"It is not absolutely certain, by any means, however, that the true location of the Castle (or Carrol) Brown entry is as claimed by the defendants; in fact, two different maps, made according to surveys made by M. J. Walker and W. H. Havron, upon whose testimony as to location the defendants largely rely, do not correspond in every respect. One of the maps made by these parties showed what they called the correct location of the Staub 5,900 acres as touching and bounding the incor-

rect location upon the north, while another map, made by Mr. Havron, shows a space between these two locations of some considerable distance, and shows that they do not touch at all. It is also shown in the testimony of these two witnesses that they did not survey all the lines of these tracts, and especially the Castle (or Carrol) Brown tract, and there are some things in the testimony of these engineers which indicates that there may be some doubt as to the correct location of the Castle (or Carrol) Brown entry, as made by them.

"It further appears that a great many surveys have been made of these Barrell grants, lands, and other conflicting entries, and that there has been a conflict in the location of the several entries and grants, and particularly as to the correct location of the Castle (or Carrol) Brown entry and grant. It is shown in an old map filed and referred to as an exhibit by Charles Seymour, which is proven to have been an old map that was made for the Barrell heirs and the Monroe heirs, that the Castle (or Carrol) Brown entry is there located differently from what the defendants now contend to be the correct location.

"It further appears that, some time after this land had been sold to Staub, the remaining Barrell lands were sold by the Monroes and others to Messrs. Brown and Spears, or a company represented by them, and that there was turned over to these parties an old map, purporting to be the final map which had been adopted as the result of many surveys, which shows the location of

the Castle (or Carrol) Brown tract to be as now claimed by, the complainant. A copy of that part of the map referring to these particular lands is made in Exhibit No. 1 to the deposition of Mr. A. R. McKenzie. . . . This map shows the Castle (or Carrol) Brown entry to be located adjoining the tract claimed by Peter Staub, and according to this map, and if the Castle (or Carrol) Brown entry be correctly located, as there shown and claimed, the Peter Staub tract of land, as conveyed by the deeds to Peter Staub, is correctly located as claimed by the complainant. But we think the weight of the evidence shows that the Castle (or Carrol) Brown entry was not properly located, on this map, and that the weight of the evidence shows, although the matter is not without considerable doubt, that the Castle (or Carrol) Brown entry was and is located at least approximately, at the point claimed by the defendants. As to what was done at the time Peter Staub purchased these lands from the agents of the Monroe heirs, we find the facts to be as follows:

"In about 1869 Staub, desiring to make an investment and having been interested in the Swiss colony near this place, visited these lands and finally negotiated with the agents of the Monroes a trade, and the precise land now claimed by the complainants was pointed out to Staub by the agents of the Monroes and examined by him. Afterwards the agents of the Monroes had the land surveyed out, and the tract actually sold was in fact surveyed on the ground, and the lines were designated and marked. At least it is reasonably certain that the north

boundary and the west boundary and a greater part of the south boundary were actually run and marked and located as now claimed by the complainant. It appears that no marks have been found on the east boundary of the tract, and it may be that that line was not marked, but simply platted out; but the other lines, the weight of the evidence shows, were, prior to the making of the deed, actually run and marked on the ground, and the beginning corner was located at the point where the complainant now claims it is located. After this was done, the deed was made by Massey Hill, attorney in fact for the Monroe heirs, and we believe and find that the parties—that is to say, Staub and the agents representing the Monroe heirs—all clearly understood what land was to be sold, and it was the purpose and intention of all that the land located as now claimed by the complainant was included in the sale. We think there was no misunderstanding between the parties as to the exact land sold, and it was the land claimed by the complainant, and located as now claimed by the complainant, and on behalf of the complainant."

The court of chancery appeals further say, in another part of their findings:

"We should also further state that it appears that, when the land was originally surveyed and sold to Staub, monuments were set up, and lines and corners marked; at least, we are satisfied from the proof that the lines were marked, and from the deposition of Mr. W. H. Havron, witness for the complainant, we infer

that the corners were marked and established at that time. He states in his deposition that he had run around the lines of the Staub land as claimed by the complainant, and states what lines and corners were found and marked and designated. He was asked to state to what extent the lines were marked and how the corners are marked, and he answered: 'It began on the location as claimed by Staub on the point of the ridge north of Glat Rock branch. When I saw it first, some one had set up a high stone. We found some old pointers, the old black oak, I believe. We ran south from there forty-seven poles, and found pointers around that. We then ran west, finding it marked occasionally through to the Altamont road, where it strikes the road at Frank Sweeton's fence. There were two crosses on a tree, a cross on an old red oak, and about four poles south of there a white oak has got an old cross on it.'

"He then goes on to tell how far the lines were marked, showing, as we have heretofore stated, that they were marked on the north and west, and for a considerable distance on the south, line of the tract as claimed by Staub.

"McKenzie, in his deposition, also shows the same thing. Staub testifies, as we have heretofore stated, that before he bought the land it was surveyed out, the lines run and marked, and boundary lines located and established before the deed was executed to him. There is no direct proof as to when the stone corners referred to by Mr. Havron were erected; but from this testimony

we think it fair to infer, it not being shown that they were set up and established at any other time, that it was done at this time, when the land was thus located for the purpose of the trade, and we so find."

The court of chancery appeals also finds:

"We believe and find that Hill, the attorney in fact, and the agents and surveyors who made the surveys of the land before the deed was made to Staub, understood and supposed that the Castle (or Carrol) Brown tract was located as shown on Exhibit No. 1 to McKenzie's deposition, and for that reason, when the deed to Staub was drawn, the beginning corner was called for as forty-seven poles north of the southeast corner of the Castle (or Carrol) Brown tract, and it was believed by them that the southeast corner and the south boundary line of the Castle (or Carrol) Brown tract was correctly located, as shown on the map of Exhibit No. 1 in the McKenzie deposition.

"We believe that in this they were mistaken, but we state it to be one of our findings that it was understood and believed by the parties at that time that the Castle (or Carrol) Brown tract was so located, and we think there is no doubt that all the parties thought the calls were correct, and there is no doubt in our minds, and we find, that the parties intended to locate the tracts sold as now claimed by the complainants."

Again that court finds:

"It is obvious that the parties believed that they were locating the beginning corner along the Castle (or Car-

rol) Brown lines, and that they at that time had maps showing the Castle (or Carrol) Brown lines as adjoining the location of the Staub tract, as now claimed by the complainant."

The court of chancery appeals further finds:

"At the time the land was surveyed, preparatory to making the deed to Staub, Baur, the surveyor, had a map and deeds to run by. It was a map represented by the Barrell heirs to Staub and his agents, as a map of the land claimed by them and the Monroe heirs. They had also, at that time, a copy of the original agreement of purchase. The survey was made, the corners were established, and then the deed was accordingly made by Massey Hill, attorney in fact for the Monroe heirs. Isbell & Bouldin, representatives of the Monroe heirs, were present when the beginning corner was established, examined the papers, and agreed that the corner was all right; and after this, and on the report of this survey, and after the lands had been seen, and the lines had been seen, by the agents of both parties, the deed was made by Massey Hill, attorney in fact."

Again that court finds:

"When Mr. Staub was negotiating for the purchase of this tract of land, Mr. Hill was a general attorney in fact of the Monroe heirs, and it appears that he had employed to assist him Mr. Isbell and one J. M. Bouldin. J. M. Bouldin, at the request of the general attorney, Hill, acting for the Monroe heirs, pointed out the land to be sold to Mr. Staub. This was before any agreement

had been entered into in regard to it. A written agreement was then entered into; this agreement being made at Manchester. Subsequently the land was surveyed out by an engineer employed for that purpose by Mr. Hill. At the time the beginning corner was located in this survey, Messrs. Isbell & Bouldin, attorneys and agents representing the Monroe heirs, were present, and they agreed upon the location of the beginning corner as being the correct place to locate it. At that time the testimony shows, and we find, that the engineer had deeds, the written agreement of parties, and maps represented by the agents of the Monroe heirs as being correct, and these agents all agreed upon the location of the beginning corner, and after this survey was made, and the lines thus established, the deed was drawn up by Mr. Isbell, of Isbell & Bouldin, and executed by Mr. Hill, the attorney in fact for the Monroe heirs, in the presence of Isbell & Bouldin and Peter Staub."

The court of chancery appeals further finds:

"It is true that the map filed as Exhibit 1 to the deposition of McKenzie was taken from a map made in 1880 or 1884; but, as we understand the evidence, this map was the result of previous surveys and maps, and the testimony of Jacob Fehr is to the effect that he was along at the time the original survey was made, and assisted in the survey; that J. M. Bouldin and P. C. Isbell, agents of the Monroes, were present and agreed on the beginning corner, and that Baur, the surveyor, had a map and deeds to run by; that it was a map rep-

resented to them by the Barrell heirs as a map of the lands claimed by them and the Monroe heirs; and that Isbell & Bouldin agreed on the beginning corner, located, as we understand, according to this map, as correctly located. But from this evidence, taken in connection with the map that came into the hands of Brown and Spears from the Monroe heirs, we have inferred and find that these parties had, at the time of this survey and conveyance, a map showing the Carrol Brown tract located as now claimed by the complainant."

The court of chancery appeals further says:

"We should also state that this record shows, as demonstrated by the various maps filed, of which fact also we might have taken judicial knowledge, if the positive proof had not shown it in this case, that in this section, as elsewhere in the mountain lands of Tennessee, there were a great many conflicting entries, lines, and grants. And it is also obvious that there was more or less uncertainty as to the location of different tracts.

"It appears, as we know, that, at the time many of these original entries and surveys were made, many entries and surveys were made without knowing the exact and proper location of other entries and grants, and frequently that the location of such entries and grants were quite uncertain, and frequently misunderstood or mistaken. It was, of course, the duty of the official surveyors to make entries so as not to conflict with others; but, there never having been any systematized official survey made, it was difficult and sometimes

almost impossible to tell where previous surveys had been made, and generally there was not much attempt to ascertain this, so that a great confusion resulted as to the location of lines and as to the location of previous entries and grants, the correct location of many of which are to this day unknown all through the mountain sections."

The court of chancery appeals further finds that Staub took possession immediately after the sale was made to him, although it does not appear that he had any actual inclosures, or had any tenants living upon it, until about 1895; but he had at once appointed an agent to look after the land, to keep trespassers off, and that he let contracts from time to time to parties to cut timber on the land, and they did so under these contracts, cutting saw logs, etc.

It is likewise found that after the deed to Staub was made, both the Barrel and Monroe heirs made deeds to other parties, calling for the Peter Staub tract, located as now claimed by the complainant, and recognized that location as the true one, and that this recognition was also accorded after the litigation between Staub and the Monroe heirs referred to in a former part of the finding of facts.

With respect to the persons involved in this litigation the court of chancery appeals finds further upon this subject as follows:

"While no question was made as to the boundary, we believe, are satisfied, and find that the parties' then

understood that the tract of land was located as now claimed by and on behalf of the complainant, because previous to this time, and immediately after the sale to Staub, he had taken possession of the land and was paying taxes upon this particular tract, which, previous to his purchase, as we have said, had been surveyed out by the engineers and agents of the Barrell heirs, and for part of the taxes paid upon this same land there had been a judgment against Monroe and the married women above named in favor of Mrs. Staub. In addition to this, the Monroe heirs, including E. S. Monroe, and the married women, Mrs. Eastman, Mrs. Cobb, and Mrs. Smith, had on the 15th of January, 1883, executed a deed to the Tennessee Coal, Iron & Railroad Company for a tract of land, a part of the description in which deed reads: 'Beginning at the point where Sally's branch crosses the south boundary of the Staub 5,900 acres; thence with the south boundary of said Staub tract to west boundary line of A. J. Roddy's one hundred-acre tract; and thence'—and so on, containing calls for tracts and natural boundaries which conclusively show that the Staub tract called for was then considered and understood by them to be located as now claimed by the complainant. This conveyance was signed and acknowledged by all of these parties, and the acknowledgments of the married women were taken and certified as required by law, so that, so far as they could do so, and in this way, both E. S. Monroe and

117 Tenn—46

the married women have recognized and adopted the location of the tract as now claimed by the complainant, and unquestionably, when this litigation was had, and when their lands were sold by this decree, it was understood by them that the land was located as now claimed by the complainant, and that this was the particular land that was sold."

"The Thomas Coal & Land Company purchased this land in litigation, and other lands, paying therefor some $50,000," continues the court of chancery appeals, "and we assume that it did not know of the location of the Staub lands; but at the time of its purchase Mr. Staub was in possession of these lands. Other deeds had been made which appear on the record calling for the location as now claimed by him, and all the facts which have been developed by this record could on an investigation at the time of their purchase, such as has been made since, have been developed. The fact that Staub had a tenant on this particular land at the time they purchased was enough to put them on notice of his claim, and it was generally known in this neighborhood at the time of their purchase where Staub claimed this tract of land to be located. We think a very slight inquiry should at least have put the parties upon notice as to the claim of the complainant. Mr. Jones, who was the agent of the Thomas Coal & Land Company, testified that, when he was looking at the question of title of this property, he found on the records a deed from Massey Hill, attorney in fact, to Peter Staub, and that he then

Staub v. Hampton.

made inquiry as to the location of the land from the county surveyor in the office of the latter, and he states that he inquired of Mr. Walker and L. V. Woodlee if they knew where these lands were located, and they told him they did not. We do not doubt that Mr. Jones was telling the truth; but this shows he had started an inquiry, and we think the mere fact that the county surveyor did not know where the land was located did not justify Mr. Jones in stopping there, and does not create an equity in favor of the defendants."

SPEARS & SPEARS and WHITSON & MERCER, for complainants.

CHAMBLISS & CHAMBLISS, LYNCH & LYNCH, and W. H. HAMPTON, for defendants.

————

MR. JUSTICE NEIL, after making the foregoing statement of facts, delivered the opinion of the Court.

It is true the description contained in the deed is perfectly clear upon its face; but one term in that description necessitates an inquiry into matter *dehors* for the purpose of applying the description—that is, an inquiry into the location of the C. Brown entry. Upon the opening of this matter by evidence, it appeared that the parties to the conveyance had with them, when the preparatory survey was made, a map or maps which placed the Brown entry in a certain position; that is, assuming this to be correct, they began their survey upon the east

boundary line of that entry at a point forty-seven poles north of its southeast corner, then ran south of the southeast corner, then west with the south boundary line of that entry to a point beyond its southwest corner, then south a given number of poles, then east a given number, then north, then west to the beginning; that the beginning point, and the corners along these lines, except, perhaps, the east line, were marked with piles of stone, and indicated by trees marked as pointers; and that the deed, as a preliminary to the drafting of which the survey was made, was executed, embodying the results of that survey. The same inquiry disclosed the fact that, while the true location of the Brown entry was not by any means free from doubt, yet the weight of the evidence favored the conclusion that it was at a different place, further to the north than shown by the maps just referred to; so that, if complainants are compelled to apply the description contained in the deed to the newly ascertained or presently ascertained location of the Brown entry, the deed wholly fails to cover the land which they contracted for, and which they surveyed, but, on the contrary, embraces land far to the north of that land. Under the facts proven, there is no doubt that the minds of the parties met upon the sale and purchase of the tract which was surveyed and marked, and that they thought they were putting this land into their deed, and, further, that they did put this land into their deed, unless they are confined to what

is shown now to be the true location of the Brown entry.

Are they so bound? It is insisted that they are, because the evidence of the survey, and of the map used as a basis for it, and the attendant evidence supporting the conclusion that the minds of the parties met upon the surveyed tract, was incompetent, as tending to vary a written instrument. The rule is general, of course, that a written instrument cannot be varied by parol evidence. If that rule can be held applicable to the present controversy, still, evidence introduced for the purpose of clearing up a latent ambiguity does not fall within its inhibition. Do the facts shown in the present case exhibit an instance of such an ambiguity? We think they do. It is true that on the face of the deed alone, distinct and apart from the inquiries into facts which it implies and necessitates, no question arises; but, when these necessary inquiries are made, an ambiguity at once starts forth. It appears that S. B. Barrell had very numerous grants, covering scores of thousands of acres of land; that the location of lands in the mountains, under grants, where the land in question lay, is often very difficult; that there was doubt and uncertainty concerning the location of the Brown grant or entry (one of the Barrell grants); that there were two locations current, one location that by which complainants and the Monroe heirs were guided when the survey was made and the deed was executed, and the other that one which is now shown to be the correct one—the only

one known at the time to the parties to the deed being the first mentioned, that by which they were guided. It was competent to introduce evidence of these facts to show what the parties meant when they referred to the Brown entry, and thereby to lay down upon the ground the description contained in the deed.

Oral testimony is admissible to identify land described in a conveyance. *Murray* v. *Hobson,* 10 Colo., 66, 13 Pac., 921; *Greeley* v. *Weaver* (Me.), 13 Atl., 575; *Bulkley* v. *Devine,* 127 Ill., 406, 20 N. E., 16, 3 L. R. A., 330. And see *Finlavson* v. *Finlavson,* 3 L. R. A., 803, note, and *Bulkley* v. *Devine,* 3 L. R. A., 330, note; *Curtis* v. *Aaronson,* 49 N. J. Law, 68, 71, 7 Atl., 886, 60 Am. Rep., 584. A written lease purported to demise "all the right to quarry marble on the farm of Henderson Fudge, known as Rose Hill." It was held that parol evidence was admissible to show that there was a farm of Henderson Fudge known as "Rose Hill." *Dougherty* v. *Chesnutt,* 86 Tenn., 1, 5 S. W., 444. The same principle is recognized in *Snodgrass* v. *Ward,* 3 Hayw., 40; *Weatherhead* v. *Sewell,* 9 Humph., 289; *Dobson* v. *Litton,* 5 Cold., 619. Land conveyed by deed was described only by the number of the section, township, and range, not stating the county or district. It was held that, nothing further appearing, a case of patent ambiguity was presented, which rendered the deed void, but that the addition of the words, "all that part lying south of Black creek," removed the patent ambiguity, and rendered parol evidence admissible for the pur-

pose of identifying the particular tract. *Black* v. *Pratt Coal & C. Co.,* 85 Ala., 504, 509, 510, 5 South., 89.   De Witt sold to Miles certain land in the northeast corner of survey 323, in Tom Green county, Texas, and executed to him a deed.   But the evidence on the trial clearly showed that the north boundary line of survey No. 323 was several hundred yards further south than it was supposed to be when the deed from De Witt to Miles was executed.   The defendant Miles pleaded in reconvention, and set up claim to the tract of land in the true northeast corner of survey No. 323, which corresponded to the boundaries in his deed, which land was also claimed by plaintiff Koenigheim.   The defendant's plea contained the statutory elements of an action to try title.   Testimony was introduced by the plaintiff to show that the land conveyed in the deed made by De Witt to Miles was situated in the northeast corner of the survey, as it was then supposed to be, and not in the northeast corner of the survey as subsequently established; and it was satisfactorily proven that the tract had been surveyed upon the ground, and its corners marked, and that the description in the deed corresponded accurately with these marks.   The agent through whom the purchase was made testified that this was the land actually sold and intended to be conveyed, and Miles himself testified that he went into possession of it and built a house on it.

"Now," said the court, after reciting the foregoing facts, "the appellant in the cross-appeal claims, that by

reason of the fact that the deed called for the northeast corner of survey No. 323, he has the right to claim the land in the northeast corner of the true survey, embraced by lines running the course and distance called for in the deed, or, at least, all of that tract which is included in the conveyance from De Witt to plaintiff, and that it was error to admit the evidence showing that the land described in his deed was not a part of the true survey. But the law does not sustain his claim. Having bought a well-defined tract, marked upon the ground, he acquired such title as his grantor had in this, and no right to any other land. If the call for the northeast corner of survey No. 323 was false (and the evidence showed that this was a fact), this call must be rejected and disregarded. The rule is general that the boundaries of a grant, as actually surveyed, are the limits of the grantee's right, and will control calls for the unascertained boundaries of existing surveys. These appellants cannot shift the locality of their grant from the ground upon which it was originally laid out and designated to another place, merely because it is shown that its corner is not the true corner of the original survey called for. The court did not err in admitting evidence to show the true location of the land described in the deed under which these appellants claimed; and it being found that the deed of the plaintiff, in the court below, which was older than that last mentioned, embraced all the land in controversy lying south of the true north boundary line of survey No. 323, it did not err in giving him judgment

Staub v. Hampton.

for the land extending to that line." *Koenigheim* v. *Miles,* 67 Tex., 113, 123, 2 S. W., 81, 87.

In a deed to land, a portion of the premises conveyed was described as "the horse shed on the west side of the north and south highway, . . . together with the land conveyed by the same, . . . the grantee to have the right and privilege to go on land of grantors around said shed for the purpose of repairing the same." It was held that the land conveyed was that actually covered by the horse shed as it then stood, and that the line of the highway referred to was the apparent highway, and not the line of the highway as subsequently found upon actual survey to cross the land further to the west than the east line of the shed. *Bristol Mfg.* v. *Barnes,* 54 Conn., 53, 55, 57, 5 Atl., 593.

A deed, and the plat with reference to which the deed was made, called for the south line of a certain street as a boundary. This south line had been established and acquiesced in for more than thirty years. Other lots had been sold and improvements erected on the assumption of the accuracy of this line. A more recent survey tended to show that the line was wrong. It was held that the grantee must be confined to the limits of the old survey. *Wilmarth* v. *Woodcock,* 33 N. W., 400, 66 Mich., 331; 9 West, 895. And see *O'Brien* v. *King,* 49 N. J. Law, 79, 85, 7 Atl., 34; *McShane* v. *Main,* 62 N. H., 4.

Land conveyed in a deed was described therein by the number of the lot and the range in a town, according to the plan of a certain surveyor named, who had surveyed

the part of the town including the land into lots and
ranges, and made a plan of the surveys of the whole
town.   It was held that the lines run by him upon the
surface of the earth, as and for the boundaries of that
lot, would still be its boundaries, if their locality could
be found, rather than the lines indicated on the plan.
*Bean* v. *Bachelder,* 78 Me., 184, 186, 187, 3 Atl., 279.
When a line has been actually run; and a corner marked,
this will determine the boundary, though in a deed of
the land the line is described as following the run of a
creek not reached by such line.  *Baxter* v. *Wilson,* 95 N.
C., 137.  The deed, under which a defendant in ejectment
claimed, called for a line of a certain length.   The fact
was that, in a survey made by the parties to the deed,
that line was marked upon the ground of a shorter
length, and the deed was afterward drawn with the dif-
ference unobserved.   It was held that the line of the deed
must be controlled by the line as marked on the survey.
*Morse* v. *Rollins,* 121 Pa., 537, 542, 543, 15 Atl., 645.
When land is described in a deed by reference to a sur-
vey, and also to a map thereof, it is to be presumed, in
the absence of contrary proof, that the map correctly
represents the survey and the latter need not be looked
to; but, if a discrepancy between the two be shown to ex-
ist, the survey itself must control.  *Whiting* v. *Gardner,*
80 Cal., 78, 80, 22 Pac., 71.   When a deed of a city lot
refers to an official map of the city, and also to stakes
at the corners of the lot, parol testimony is admissible
to show that the official map is inaccurate, and was com-

piled from other maps without actual survey; that the stakes referred to were set by another surveyor, who located the lot when it was granted by the city trustees, as the basis of their grant; and that the tract which the city intended to sell and the grantee intended to buy was then staked off and definitely located by such surveyors. *Cleveland* v. *Choate,* 77 Cal., 73, 78, 18 Pac., 875. In deeds of adjoining lands, the boundary was described by varying courses, which would make a difference of several feet in the location of a corner common to both. It was held that a stake marking the corner, placed without dispute, would control, as a known, fixed monument. *Beaudry* v. *Doyle,* 68 Cal., 105, 8 Pac., 694. Other authorities in the same line are *Brown* v. *Gay,* 3 Me. (3 Greenl.), 126; *Ripley* v. *Berry,* 5 Me. (5 Greenl.), 24, 17 Am. Dec., 201; *Herrick* v. *Hopkins,* 23 Me., 217; *Knowles* v. *Toothaker,* 58 Me., 172, 174,175, 176; *Hall* v. *Davis,* 36 N. H., 569, 571; *Richardson* v. *Chickering,* 41 N. H., 380, 384, 75 Am. Dec., 769; *Kellogg* v. *Smith,* 7 Cush. (Mass.), 375; *Peck* v. *Mallams,* 10 N. Y., 509, 532; *Blasdell* v. *Bissell,* 6 Pa., 258, 259; *Thompson* v. *McFarland,* 6 Pa., 478, 480; *Banks* v. *Ammon,* 27 Pa., 172, 174, 175; *Dawson* v. *Mills,* 32 Pa., 302, 306; *Ogden* v. *Porterfield,* 34 Pa., 191, 195, 196; *Lodge* v. *Barnett,* 46 Pa., 477, 484; *Riddlesburg, etc., Coal Co.* v. *Rogers,* 65 Pa., 416; *Craft* v. *Yeancy,* 66 Pa., 210, 214; *Cherry* v. *Slade,* 7 N. C., 82; *Ring* v. *King,* 20 N. C., 301; *Kronenberger* v. *Hoffner,* 44 Mo., 185, 192, 193.

In our own State we have the following cases: *White's*

*Lessee* v. *Hembree,* 1 Tenn. (Overt.), 529, 533, 534; *Blount's Lessee* v. *Medlin,* 2 Tenn. (Overt.), 200; *Heirs of Williams* v. *Buchanan,* 2 Tenn. (Overt.), 279, 281, 282, 283, 284; *Smith* v. *Buchanan,* 2 Tenn. (Overt.), 307, 308; *McNairy* v. *Hightour,* 2 Tenn. (Overt.), 302, 304; *Dallum* v. *Breckenridge,* Cooke, 154, 158, Fed. Cas. No. 3547; *Jordan* v. *Payne,* Peck, 320; *Roberts* v. *Cunningham,* Mart. & Y., 73; *Garner and Dixon* v. *Norris,* 1 Yerg., 62, approving *Person* v. *Roundtree,* 2 N. C., 378, note; *Massengill* v. *Boyles,* 4 Humph., 205; *Bell* v. *Hickman,* 6 Humph., 401; *Funa* v. *Manning,* 11 Humph., 311; *Tate* v. *Gray,* 1 Swan, 74; *Smith* v. *Jones,* 3 Sneed, 533; *Nolen* v. *Wilson,* 5 Sneed, 337; *Mayse* v. *Lafferty,* 1 Head, 60; *Martin* v. *Nance,* 3 Head, 650; *Dyer* v. *Yates,* 1 Cold., 138; *Disney* v. *Coal Creek Min. & Mfg. Co.,* 11 Lea, 612, 613, 614; *Turnage* v. *Kenton,* 102 Tenn., 332, 52 S. W., 174.

It is insisted for defendants that all of the foregoing were cases in which the survey was made by a public surveyor, as a preliminary to the issuance of a grant by the State, and that the rule which gives commanding importance to the survey and the marks made upon the ground pursuant thereto, in arriving at the intention of the parties as to the identity of the land sold and purchased, in case of an apparent conflict between the written conveyance and such actual survey and marking, applies only to such public surveys and to grants by the State, and not to deeds between private persons. Before entering upon a consideration of the point it is due that

we should quote from our cases the rule as it has been heretofore applied.

In *Garner and Dixon* v. *Norris' Lessee* it is said: "Will the grant cover an original survey, though not conformable to its calls?  This is, of course, to be understood as against the State and subsequent claimants to the survey.  This point has been settled, long ago, by the case of *Person* v. *Roundtree,* which is considered a leading case.  2 N. C., 378, note.  'Roundtree entered a tract of land lying on Shoco creek; running south, then east, then north to the creek, then up the creek to the beginning.  In the grant the courses were reversed, beginning on the creek at a tree, and running north, then east, etc., placing the land on the opposite side of the creek from that on which it was really surveyed, so that the grant did not cover any of the land surveyed.  Roundtree settled on the land, which was afterwards entered by Person, who got a grant and brought an ejectment.'  The case was several times argued, and at last determined, by the unanimous opinion of the court, that the mistake of the surveyor or secretary who filled up the grant should not prejudice the defendant, but that he was well entitled to the land intended to be granted, notwithstanding the calls of the grant may not cover a single foot of it.  Still, in contemplation of law, it shall cover it, and protect the land surveyed to the party."  1 Yerg., 62, 66, 67.

To the same effect, *Nolen* v. *Wilson,* 5 Sneed, 332, 337· 339.

In *Dyer* v. *Yates,* it is said: "There is an admitted error in the calls of the grant, . . . but the lines had all been plainly marked at the time of the original survey. . . . The error in the grant was not material, though its calls, literally pursued, did not take in all the land covered by the entry and appropriated by an actual survey and marking of the lines and corners; yet in legal contemplation it did cover all the land and vest the grantee with a legal title to the same as fully as if the calls had exactly conformed to the entry and survey, because upon the facts stated the law corrected the erroneous call, and supplied the proper calls without any correction in point of fact." 1 Cold., 136, 139-140.

It has been held that the rule of these cases applies equally to transactions between private persons. In *Hale* v. *Darter* it is said: "It is insisted that the circuit judge erred in charging the jury 'that if the owner of one or more adjoining tracts of land sell a portion of it and make a survey of it, and a deed in pursuance of that survey, the purchaser is entitled to the land actually surveyed, provided those lines and corners can be established and identified as having been actually run and made at the time of the sale, and that course and distance must yield to what is proved to have been the actual survey.' At the time of the sale to Gillenwaters, Hopkins owned a large body of land, including that now in dispute. They went on the ground, and Hopkins pointed out and designated the land which Gillenwaters agreed to buy. Afterwards they procured a surveyor,

ran out and marked the lines and corners of the tract, and Hopkins executed a deed for the same to Gillenwaters. The party making the sale had a perfect right to make what corners he pleased on his own land, and call them whatever name he chose. The purchaser cannot be concluded by any technical rule of law from showing the land he actually bought and had surveyed to him, although, by an error or oversight in drawing his deed, there may be some conflict between the courses and distances called for and those actually run and marked at the time of the survey. The charge of the circuit judge upon this point we deem to be in substantial, if not in literal, conformity to the repeated adjudications of this court." 10 Humph., 92, 93, 94.

In *Mayse* v. *Lafferty*, supra, the same rule was applied to a survey made in a partition proceeding wherein the lands of private persons were divided. And in *Dyer* v. *Yates* (last paragraph of the opinion) the rule was applied alike to a grant of the State and a deed made by a private person. 1 Cold., 141.

Moreover, nearly all the authorities which we have cited from other jurisdictions involved transactions between private persons, in which the rule was applied. It will not be amiss to refer to and quote from two or three of these.

In *Ogden* v. *Porterfield*, supra, the court, after referring to the contentions of the parties, said: "The essence of these contentions is plainly this: On the one hand, that if a line existed on the ground that the parties

agreed to and bargained by, it will control and limit
the deed; and, on the other, that the deed obliterates and
controls the line, notwithstanding it was acquiesced in
by the parties, and that it was an error in the court to
submit the question of the existence of the line, and of
the knowledge and acquiescence in it as a dividing line
on the part of James Porterfield and his heirs. The po-
sition of the defendants below is not tenable. In *Blas-
dell* v. *Bissell*, 6 Pa., 258, and in *Dawson* v. *Mills*, 32
Pa., 306, the doctrine that a conveyance, made subse-
quently to a survey, dividing land between parties, is
referable to that survey and limited by it, was fully
held. In grants by the commonwealth, they rarely, if
ever, describe the exact quantity contained in the official
survey on the warrant, and nobody ever pretended that
the survey was to be either enlarged or diminished to
accord with the patent. The survey and the conveyance
are the distinctive and operative acts in the transmis-
sion of real property, and, where they differ from each
other, one must of necessity control the other, if each
stands unaided by extrinsic explanation, or the discrep-
ancy could never be adjusted. In such an exigency,
courts have always held the demarcation of the boun-
daries as the substantive act in fixing the limits of the
grant, and the deed as evidence of them—the former the
*factum*, and the latter the representative; and hence the
rule that the survey, if unimpeachable for fraud or mis-
take, controls the deed, where there is a discrepancy as
to the extent of the grant." 34 Pa., 195, 196.

In *Lodge* v. *Barnett,* supra, it is said: "On this point
there is nothing more fixed or better ascertained than
the law of this State. The courses and distances in a
deed always give way to the boundaries found upon the
ground, or supplied by the proof of their former exis-
tence when the marks or monuments are gone. So the
return of a survey, even though official, must give way
to the location on the ground, while the patent, the final
grant of the State, may be corrected by the return of
survey, and, if it also differs, both may be rectified by the
work on the ground. One of the strongest illustrations
of this rule is to be found in the instance of the surveys
of the donation lands, set apart for the soldiers of the
Pennsylvania line in the Revolutionary War. The law
required the tract to be identified by marking the num-
ber of it upon a tree within and nearest to the north-
western corner. It was held that this number controlled
all the remainder of the description in the patent, so as
to wrest it entirely from its position and adjoiners, as
described in the patent and general draft. *Smith* v.
*Moore,* 5 Rawle (Pa.), 348; *Dunn* v. *Ralyea,* 6 Watts, &
S. (Pa.), 475. Chief Justice Gibson, in the former case,
stated the general principle thus: 'It is a familiar prin-
ciple of our system, and one in reason applicable to this
species of title, as well as any other, that it is the work
on the ground, and not on the diagram returned, which
constitutes the survey, the latter being but evidence
(and by no means conclusive) of the former. . . . It

117 Tenn—47

is conceded that the patent may be rectified by the return of survey; and why not the return of survey by the lines on the ground, and particularly the numbered tree, which is the foundation of the whole?' In the latter case, Kennedy, J., said: 'That the original lines as found marked on the ground must govern, in determining the location and extent of the survey, is a well-established rule, in general applicable to all cases.' . . . We know, in point of fact, that the marks made on the ground at the time of making the survey are the original, and therefore the best evidence of what is done in making it; that everything that is committed to paper afterwards in relation to it intended and ought to be, as it were, a copy of what was done, and ought to appear on the ground, in the doing of which errors may be committed, which renders it less to be relied on than the work as it appears by the marks made on the ground." 46 Pa., 484, 485.

In *Baxter* v. *Wilson,* supra, it is said: "The main question in controversy between the parties is whether the dividing line between their lands is the line N, M, or the line E, F, G. The plaintiff insists that the true line between them is E, F, G, because that was the line actually run when the land was divided, and the defendant contends that N, M, must be taken to be the line, because the call from H, as claimed by the plaintiff, is with the run of the creek, twenty-six chains, and, the creek being a natural boundary, the line must follow its course and terminate at the end of the distance. As a general rule the position contended for by the defendant

is correct. It has been so held by several decisions in this State, notably in *Hartsfield* v. *Westbrook*, 2 N. C., 258; *Sandifer* v. *Foster*, 2 N. C., 237; *McPhoul*, v. *Gilchrist*, 29 N. C., 169. But this is not an inflexible rule. It has its exceptions. For instance, when there has been a practical location of the land, as when it can be proved that there was a line actually run and marked, and a corner made, such a boundary will be upheld, notwithstanding a mistaken description in the deed. *Cherry* v. *Slade*, 7 N. C., 82." 95 N. C., 143.

The facts contained in the statement which concern the recognition which the Monroe heirs gave the location claimed by the complainants, even if not available by way of estoppel, a question which we do not consider here, are useful as indicating, in connection with complainants', or Peter Staub's, immediate and long-continued possession, a concurrent construction by the parties of the deed, in respect of the land intended to be conveyed by it; an important consideration in cases of the kind we have before us. *Kingsland* v. *N. Y.*, 45 Hun (N. Y.), 198; *Monfort* v. *Stevens*, 68 Mich., 61, 35 N. W., 827; *Raymond* v. *Nash.*, 57 Conn., 447, 18 Atl., 714; *Reed* v. *Proprietors of Locks and Canals*, 8 How. (U. S.), 287, 290, 291, 12 L. Ed., 1077; *Atkinson's Lessee* v. *Cummings*, 9 How. (U. S.), 484, 487, 13 L. Ed., 223; *Steinbach* v. *Stewart*, 11 Wall. (U. S.), 567, 20 L. Ed., 56; *James Irwin* v. *United States*, 16 How. (U. S.), 522, 14 L. Ed., 1038.

In *Reed* v. *Proprietors of Locks and Canals*, it is said:

"It cannot be doubted that, where a deed is indefinite, uncertain, or ambiguous in the description of the boundaries of the land conveyed, the construction given by the parties themselves, as shown by their acts and admissions, is deemed to be the true one, unless the contrary be clearly shown. The difficulty in the application of the descriptive portions of a deed to external objects usually arises from what is called a 'latent ambiguity,' which has its origin in parol testimony, and must necessarily be solved in the same way. It therefore becomes a question to be decided by a jury what were the intentions of the parties to the deed. From this view of the case, as exhibited by the record, it clearly appears that the question whether the demanded premises were included within the limits of the mortgage, or intended so to be, were submitted by the parties and by the nature of the case to the jury, and that, in order to arrive at a correct decision of the issue, the jury should be instructed to weigh the testimony as to the 'monuments, length of lines and quantities, actual occupation, etc., and decide according to the weight of the evidence. And such is the meaning, and no more, of the language of the court now under consideration. We can perceive no error in it." 8 How. (U. S.), 290, 291.

In *Atkinson's Lessee* v. *Cummings,* it is said: "The general rule is well stated by Tindall, C. J., in the case of *Miller* v. *Travers,* 8 Bing., 244, that in all cases where a difficulty arises in applying the words of a will or deed to the subject-matter of the devise or grant, the diffi-

culty or ambiguity which is introduced by the admission of extrinsic evidence may be rebutted or removed by the production of further evidence upon the same subject, calculated to explain what was the estate or subject-matter really intended to be granted or devised." 9 How. (U. S.), 486.

In *Cavazos* v. *Trevino,* 6 Wall. (U. S.), 773, 785, 18 L. Ed., 813, it is said: "The instruction given as to the acquiescence of the parties in respect to the line run for a long period was correct. The practical interpretation which the parties, by their conduct, have given to a written instrument in case like this, is always admitted, and is entitled to weight. There is no better test of the intention of the instrument. None are less likely to be mistaken. There is no danger of too large an admission. Safer testimony can hardly be presented in relation to any transaction occurring in human affairs."

In the same case the court also said: "In construing this grant, the attendant and surrounding circumstances at the time it was made are competent evidence for the purpose of placing the court in the same situation, and giving it the same advantages, for construing the paper which were possessed by the actors themselves. The object and effect of such evidence are not to contradict or vary the terms of the instrument, but to enable the court to arrive at the proper conclusion as to its meaning, and the understanding and intention of the parties." *Cavazos* v. *Trevino,* 6 Wall. (U. S.), 784.

And this is but an application of the general doctrine

that "courts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Nash* v. *Towne,* 5 Wall. (U. S.), 699, 18 L. Ed., 527.

So, at last, the true purpose of the evidence upon the subject of recognition of the location by the Monroe heirs, and by the complainant and her predecessor in title, Peter Staub, as well as of the other evidence concerning the existence and use of the maps in the survey made at the time, fixing the place of the Brown entry on the ground, as its location was then understood, and of the marks made upon the ground at the time, was to place the court in the position of the parties to the deed, and to enable it to see the contemporaneous facts as they saw them, and to understand the terms of description used in the deed as they understood them, as well as and thereby to ascertain the land which in legal contemplation the deed covered; the law, as said in *Dyer* v. *Yates,* supra, correcting the apparent error in the reference to the Brown entry considered as of the presently ascertained location of that entry, so as to conform that reference to the location as understood when the survey

and deed were made, the law supplying the proper call "without any correction in point of fact."·

Defendants insist that the doctrine supported by the cases above referred to concerning the rank accorded to marks made upon the ground in ascertaining the land actually intended to be conveyed, and really passing under the deed, in case of an apparent conflict between the latter and these marks, is contrary to the policy of the registration laws, may infringe the rights of innocent purchaser, and is, in effect, a means of accomplishing in an action at law, by oral evidence, a result that can be rightfully attained only under a bill in equity to reform the deed.  To this we answer that the registration laws are not involved in the present controversy, nor are the rights of an innocent purchaser, since Staub was in possession when the Thomas Coal Company bought the land, and the statement of facts shows there were other facts sufficient to put the defendant on notice.  *Banks* v. *Ammon,* 27 Pa., 172, 175; *Macon* v. *Sheppard,* 2 Humph., 335, 338, 339; *Davis* v. *Cross,* 14 Lea, 637, 642, 52 Am. Rep., 177.  Nor is it material, if it be true, that the same result is reached as if a bill in equity had been filed to correct the deed, since the rule applied is an old one, in effect a rule of property, long recognized and supported by indubitable and multitudinous precedents.

It is next insisted that the rule is in the teeth of the statute of frauds; but this objection is likewise not well taken, as is manifest from the basis on which it rests, as

displayed in the foregoing discussion, and the illustrations of it shown in the cases cited.

Defendants insist that they are at least entitled to the Parmley tract of 1,000 acres included within the 5,900 acres sued for, because they traced their title thereto back to the Bradshaw grant; but this is immaterial, because the latter grant is inferior to the Barrell grant, under which the complainants claim.

The foregoing disposes of all of the matters in controversy, with the result that we find no error in the decree of the court of chancery appeals; and it must be affirmed.